FILED
COURT OF APPEALS
DIVISION II

2014 AUG 26 AM 11: 38

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44175-6-II |
| Respondent, | |
| v. | |
| TIMOTHY ALLEN CONOVER, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Timothy Allen Conover appeals his jury convictions and standard range sentences for three counts of delivering heroin within 1,000 feet of a school bus route stop. He argues that the trial court (1) violated his right to a public trial by locking the courtroom door for a half hour during jury instructions; (2) erred in overruling his objection to the reasonable doubt instruction, which included "an abiding belief in the truth of the charge," Br. of Appellant at 13; (3) erred in calculating his offender score when the State failed to present any evidence of Conover's prior criminal history, which error the State concedes; and (4) erred in running Conover's bus route stop enhancements consecutively rather than concurrently under RCW 9.94A.533. For the first time on appeal, Conover also challenges the jury instruction on the violation of the Uniform Controlled Substances Act (VUCSA)[1] as unconstitutionally vague and asks us to strike the jury's aggravating factors findings, even though the trial court did not

_____
[1] Ch. 69.50 RCW.

No. 44175-6-II

impose an exceptional sentence. We affirm Conover's convictions. Accepting the State's concession of error in failing to prove Conover's prior convictions, we vacate the sentences and remand for resentencing.

## FACTS

### I. CONTROLLED BUYS

On May 13, 2011, Cowlitz-Wahkiakum County Drug Task Force Detective Russell Hanson and Detective Michael Meier organized a controlled buy using a confidential informant (CI). The CI called Timothy Conover to arrange to purchase heroin and told Hanson that Conover had a quarter-ounce of heroin for sale for $400. Hanson and Meier gave the CI $400 for the transaction. The CI met Conover in a motor home at Seventh and California Way, which was located within 1,000 feet from a school bus route stop for the Longview School District. The CI gave the money to Conover, who gave the CI a clear plastic bag containing tar heroin. The CI turned over the heroin to the detectives.

On May 31, Meier again worked with the CI to arrange another controlled buy from Conover, this time, a quarter-ounce of heroin for $350. The CI went to Conover's apartment, chatted a little, and "completed the deal." Report of Proceedings (RP) (Oct. 12, 2012) at 22.

On July 7, Meier organized a third controlled buy for the CI to purchase a quarter-ounce of heroin from Conover for $350. This transaction was recorded with a wire and a video camera. Again, the CI went into Conover's home, talked, and "made the deal." RP (Oct. 12, 2012) at 23. The State arrested Conover.

2

No. 44175-6-II

## II. Procedure

The State charged Conover with three counts of selling heroin within 1,000 feet of a school bus route stop.[2] The case proceeded to a jury trial.

### A. Trial

Detectives Hanson and Meier testified to the facts previously set forth. Hanson also testified that, based on his experience with narcotics, (1) individuals could pay as low as $20 for a "hit," a tenth of a gram, of heroin; (2) heroin users did not tend to "stockpile" heroin, RP (Oct. 11, 2012) at 60; (3) users would usually buy enough heroin for only a day's use, spending about 10 to 20 dollars at a time; (4) a quarter-ounce of heroin was more than anyone would use in a day; (5) someone who bought a quarter-ounce would probably break it up and sell it, keeping "a little bit of that for their own usage." RP (Oct. 11, 2012) at 38.

The CI testified about his three heroin purchases from Conover. During the CI's testimony, the State played the audio recording of the July 7 transaction, which included discussion of the $350 purchase price and to whom the CI would resell the drugs. Victoria Giles, dispatcher, driver, and trainer for the Longview School District, testified that the May 13 controlled buy location was on a school bus route stop for the Longview School District.

Longview Police Corporal Timothy Watson, assigned to surveil all three transactions, testified that the May 31 and July 7 transactions took place on Niblett Way, within 1,000 feet from a school bus route stop. He also testified that a typical dose of heroin for "maintenance" users was about 0.2 to a half-gram or less if they were not "getting high" but "just maintaining" to "stay well." RP (Oct. 12, 2012) at 75-76. People who "abuse the drug" to get high typically

---

[2] VUCSA, ch. 69.50 RCW.

3

inject up to a gram or a gram and a half. RP (Oct. 12, 2012) at 76. Watson explained that informants would generally not be sent to buy large quantities, such as a pound, because "[r]ed flags would go up." RP (Oct. 12, 2012) at 77. Watson also testified that (1) dealers who would buy an ounce, half-ounce, or quarter-ounce, would "[break] it down further to sell to street dealers," RP (Oct. 12, 2012) at 79; (2) dealers who purchased quarter-ounces would likely break them down into "eighth amounts, cut this in half . . . an eighth of an ounce," equivalent to three-and-a-half grams, and then break them down even further to a sixteenth of an ounce, a "teener," about 1.7 grams, closer to what an "end user might be using," RP (Oct. 12, 2012) at 79-80; and (3) a maintenance user would break down a "teener" into even smaller amounts, called a "point one, point two and so on." RP (Oct. 12, 2012) at 80. Watson opined that an "end user" would not be expected to buy a quarter-ounce at a time and that it was not common for end users to save their money to buy larger quantities at once. RP (Oct. 12, 2012) at 80.

### B. Jury Instructions

Outside the presence of the jury, the parties discussed the jury instructions with the trial court. Conover had earlier objected to the State's proposed reasonable doubt instruction on grounds that the definition was sufficient without the "abiding-belief" language. RP (Oct. 12, 2012) at 3. He did not object to any of the other jury instructions. Overruling Conover's objection, the trial court gave the State's reasonable doubt instruction that included the "abiding-belief" language. RP (Oct. 12, 2012) at 4.

The trial court also instructed the jury to consider that a separate crime was charged in each count and that the State had to prove each count beyond a reasonable doubt. For the special verdicts, the trial court instructed the jury to determine (1) whether Conover's offenses took

4

place within a school bus route stop, and (2) whether the State had proved the aggravating circumstances beyond a reasonable doubt (whether the offense involved at least three separate transactions in which controlled substances were sold, transferred, or possessed with intent to do so and whether the offense involved an attempted or actual sale or transfer of controlled substances in quantities substantially larger than for personal use).

## C. Courtroom Locked Half Hour beyond Lunch Break

After the jury was instructed, Conover's counsel informed the trial court that the main entry door to the courtroom had been locked and a "Mr. Morgan" had tried to enter.[3] RP (Oct. 12, 2012) at 175-76. The prosecutor responded that (1) the main entry door to the courtroom had been locked over the lunch hour because (a) there were valuable items left in the courtroom and (b) they closed the courtroom during the lunch hour as a safety precaution when there were no courtroom proceedings; and (2) it "seemed to be like about 15—maybe 15 minutes" that the door was locked and that when Mr. Morgan had tried to enter the courtroom, he "was let in almost immediately once [they] discovered that it was locked." RP (Oct. 12, 2012) at 176. The trial court found no harm in the inadvertent locking of the courtroom door, especially when as soon as it was known that Mr. Morgan was trying to enter, the door was immediately opened. Conover neither objected nor moved for a mistrial based on this incident.

---

[3] More specifically, Conover's counsel explained:
> We should probably just put on the record the issue with respect to—and I can't recall specific times, your Honor, but with respect to the main entry door that was locked. I don't know what your Honor recalls, but the jury was seated, your Honor was reading jury instructions. If I recall correctly, the individual was trying to open the door right about the time you had completed reading jury instructions, I don't recall specifics on that, but the door was locked.

RP (Oct. 12, 2012) at 175.

## D. Verdict and Sentencing

The jury found Conover guilty of three counts of delivery of a controlled substance. It also returned special verdicts finding that (1) Conover had delivered the controlled substances within 1,000 feet of a school bus route stop designated by a school district and (2) Conover's crime was a major violation of the VUSCA, involving the attempted or actual sale or transfer of controlled substances in quantities substantially larger than for personal use.

At sentencing, other than Conover's mentioning that he might have three or four prior convictions, there was no further discussion about Conover's offender score or criminal history. The State told the trial court that (1) Conover's initial standard sentencing range was 20 to 60 months of confinement for each delivery count; (2) the three school bus route stop enhancements would add 24 months to the standard range sentence for each count, running consecutively for a total of 72 additional months; and (3) because the jury had found four different aggravating factors (three of which were that Conover had delivered substantially more controlled substances than an amount for personal use), the State recommended that the trial court also impose exceptional 10-year sentences for each count to run consecutively.

The trial court sentenced Conover to a total of 120 months of confinement: 48 months for each of his three delivery convictions, to run concurrently with each other; and an additional 24 months (school bus route stop enhancement) on each count, to run consecutively to each 48-

month sentence for the underlying convictions.[4] The trial court, however, did not impose an exceptional sentence based on the VUCSA aggravating factors under RCW 9.94A.535 as the State had recommended. Although the State introduced no documentation and Conover did not stipulate to his prior convictions, Conover's judgment and sentence included a list of his prior criminal history. Conover did not object.

Conover appeals.

## ANALYSIS

### I. COURTROOM DOORS LOCKED DURING AND HALF HOUR BEYOND LUNCH BREAK

For the first time on appeal, Conover argues that the trial court violated his First and Sixth Amendment rights to a public trial, asserting that the trial court locked the courtroom doors for half an hour "while the court instructed the jury" without first evaluating the Bone-Club[5] factors. Br. of Appellant at 8-9. Neither the law nor the record supports this argument.

Whether a defendant's right to a public trial has been violated is a question of law, which we review de novo. State v. Brightman, 155 Wn.2d 506, 514, 122 P.3d 150 (2005). A trial court violates a defendant's right to a public trial if it closes the courtroom during a public proceeding

---

[4] RCW 9.94A.533(6) provides:

> An additional twenty-four months shall be added to the standard sentence range for any ranked offense involving a violation of chapter 69.50 RCW if the offense was also a violation of RCW 69.50.435 or 9.94A.827. *All enhancements under this subsection shall run consecutively to all other sentencing provisions, for all offenses sentenced under this chapter.*

(Emphasis added.)

[5] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

No. 44175-6-II

without first determining if such closure is warranted under *Bone-Club*.[6] *Bone-Club*, 128 Wn.2d at 258-59. The closure of a courtroom "occurs when the courtroom is *completely and purposefully* closed to spectators so that no one may enter and no one may leave." *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011) (emphasis added). These rules come into play when the public is *fully excluded* from proceedings within a courtroom. *State v. Easterling*, 157 Wn.2d 167, 172, 137 P.3d 825 (2006) (all spectators, including defendant and his counsel, excluded from the courtroom while codefendant plea-bargained); *Brightman*, 155 Wn.2d at 511 (entire voir dire closed to all spectators); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 808, 100 P.3d 291 (2004) (entire voir dire closed to all spectators); *Bone-Club*, 128 Wn.2d at 257, (no spectators allowed in courtroom during a suppression hearing).

Such a closure occurs only when the courtroom is "completely and purposefully closed to spectators so that no one may enter and no one may leave"; thus, the inadvertent exclusion of only one person from a courtroom does not constitute a "closure" for *Bone-Club* purposes. *Lormor*, 172 Wn.2d at 93 (exclusion of defendant's terminally ill daughter for fear of distraction

---

[6] Before a trial court closes a proceeding to the public, it must consider the following factors and enter specific findings on the record:

    1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
    2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
    3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
    4. The court must weigh the competing interests of the proponent of closure and the public.
    5. The order must be no broader in its application or duration than necessary to serve its purpose.

*Bone-Club*, 128 Wn.2d at 258-59.

8

No. 44175-6-II

was not courtroom closure). *See also State v. Berg*, 177 Wn. App. 119, 126-27, 310 P.3d 866 (2013) (exclusion of defendants' friend from courtroom observation did not constitute courtroom closure), *review denied*, 179 Wn.2d 1028 (2014).

Here, the courtroom was not *"completely and purposefully"* closed to the public. *Lormor*, 172 Wn.2d at 93 (emphasis added). The trial court never "purposefully" locked the courtroom doors or excluded anyone from court proceedings. Rather, the courtroom was locked over the lunch hour for security purposes, when there were no proceedings; and it remained locked inadvertently for about 30 minutes after the lunch break. Moreover, once the trial court realized that the courtroom was locked, it immediately opened the doors, thereby remedying the problem. We hold that no courtroom closure occurred and, thus, the trial court did not violate Conover's right to a public trial.

## II. REASONABLE DOUBT JURY INSTRUCTION

Conover next argues that the trial court erred in overruling his objection to the reasonable doubt instruction.[7] He contends that the reasonable doubt instruction confused the jury because it stated that the jurors had to have an "abiding belief in the truth of the charge." Br. of

---

[7] Jury Instruction 3 on reasonable doubt read:
> The defendant has entered a plea of not guilty. . . The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 29.

9

No. 44175-6-II

Appellant at 13. Our Supreme Court has already reviewed and upheld this instruction in *State v. Bennett*, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007), which controls here. Thus, Conover's challenge fails.

The trial court's reasonable doubt instruction mirrored 11 *Washington Practice: Pattern Jury Instructions: Criminal* 4.01, at 85 (3d ed. 2008) (WPIC 4.01), which contains the "abiding belief" language that Conover challenges. Our Supreme Court expressly approved the use of WPIC 4.01 in *Bennett*, 161 Wn.2d at 318. *See also State v. Pirtle*, 127 Wn.2d 628, 658, 904 P.2d 245 (1995) (holding that the "abiding belief" language did not diminish the pattern instruction defining "reasonable doubt"), *cert. denied*, 518 U.S. 1026 (1996). Moreover, in a recent Division One opinion, the defendant raised the same challenge that Conover raises here to the "abiding belief" language; and, like Conover, he argued that the language was similar to the impermissible "speak the truth" remarks in *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). *State v. Fedorov*, ___ Wn. App. _____, 324 P.3d 784, 790 (2014). Relying on *Bennett* and *Pirtle*, Division One distinguished *Emery*, asserting that Emery's "speak the truth" language was improper because it expressly misstated the jury's role, whereas the "abiding belief" language accurately informed the jury that its job is to determine whether the State proved the charged offenses beyond a reasonable doubt. *Fedorov*, 324 P.3d at 790. We find the *Fedorov* rationale persuasive and adopt it here.

We hold that the trial court did not err in giving the reasonable doubt instruction containing the "abiding belief" language.

## III. SENTENCING

### A. Offender Score—No Proof of Criminal History

For the first time on appeal, Conover challenges the trial court's calculation of his offender score. He contends that the trial court erred by calculating his offender score based on the State's statement of criminal history submitted with no supporting evidence. The State concedes this error and agrees that we should remand the case to the trial court for resentencing, at which the State will have the opportunity to prove Conover's prior convictions under *State v. Hunley*, 175 Wn.2d 901, 287 P.3d 584 (2012). We accept the State's concession and proposal for remand.

### B. Running School Bus Route Stop Enhancements Consecutively to Underlying Sentences

Conover next argues that the trial court erred in running his school bus route stop enhancements consecutively to his sentences for his underlying crimes, rather than concurrently under RCW 9.94A.533. This challenge also fails.

Conover's challenge requires us to look at the statute's plain language to give effect to legislative intent. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). We determine a statute's plain meaning from the ordinary meaning of its language, as well as from the statute's general context, related provisions, and the statutory scheme as a whole. *Jacobs*, 154 Wn.2d at 600. We also interpret statutes to give effect to all language in the statute, to render no portion meaningless or superfluous, and to avoid absurd results. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003); *State v. Neher*, 112 Wn.2d 347, 351, 771 P.2d 330 (1989).

Our legislature has expressly and unequivocally provided mandatory *enhanced* sentences for certain drug offenses:

11

> An additional twenty-four months *shall be added to the standard sentence range* for any ranked offense involving a violation of chapter 69.50 RCW if the offense was also a violation of RCW 69.50.435 or 9.94A.827. All enhancements under this subsection *shall run consecutively to all other sentencing provisions*, for all offenses sentenced under this chapter.

RCW 9.94A.533(6) (emphasis added). Conover's three counts of delivering drugs occurred "[w]ithin one thousand feet of a school bus route stop designated by [a] school district," offenses that were also violations of RCW 69.50.435(1)(c), which the above RCW 9.94A.533(6) enhancement provision expressly includes.

We reject Conover's argument that only other types of "drug-crime" enhancements listed in RCW 9.94A.533 run consecutively with his base sentences for his underlying criminal convictions, not enhancements such as his school bus route stop enhancements. Br. of Appellant at 23. The plain language of the statute unambiguously requires the sentencing court to add 24 months to a criminal defendant's standard range sentence for any offense under chapter 69.50 RCW if the offense also violates RCW 69.50.435. RCW 9.94A.533(6). The statute also plainly states that all enhancements under RCW 9.94A.533(6) *shall run consecutively* to all other sentencing provisions. RCW 9.94A.533(6). In addition to the plain meaning of this enhancement statute, the legislature amended RCW 9.94A.533(6) in 2006 to require drug-related sentencing enhancements to be served *consecutively* "to all other sentencing provisions." *See* LAWS OF 2006, ch. 339, § 301.

Here, the jury found Conover guilty of three counts of delivery of a controlled substance, heroin, under RCW 69.50.401, and that these three offenses took place within 1,000 feet of a school bus route stop designated by a school district, in violation of RCW 69.50.435(1)(c). Thus, RCW 9.94A.533(6) required the trial court to run his school bus route stop enhancements

12

"consecutively" to his base sentences and to each other. *See* CP at 65, RP (Oct. 24, 2012) at 19. We hold that the trial court did not err in running these sentencing enhancements consecutively.

### C. VUCSA Aggravating Factor Findings, "Major Violations"

Conover next argues that we should strike the jury's aggravating VUCSA factor findings[8] from his record because his convictions were not "major violations of the Uniform Controlled Substances Act." Br. of Appellant at 24. He asserts that this aggravator does not apply to his heroin sales because (1) each of the three convictions was a separate "offense" that did not involve three transactions, and (2) the State failed to prove that the quantities of heroin involved were "substantially larger than for personal use." Br. of Appellant at 26. Conover acknowledges that the trial court did not impose an exceptional sentence based on the jury's finding of aggravating factors. Instead, he challenges these aggravator findings because "they are on his record." Br. of Appellant at 24. These challenges fail.

#### 1. Three separate transactions

Conover argues that the first challenged statutory aggravating factor does not apply under a plain reading of RCW 9.94A.535(3)(e)(i) because (1) this statutory factor requires a "current offense" that "involved at least three separate transactions," and (2) the State chose to charge him with three separate "current offenses" rather than a single offense comprising three separate

---

[8] RCW 9.94A.535 lists aggravating circumstances that constitute substantial and compelling reasons for an upward departure from the standard range sentencing guidelines. One of those circumstances is when the defendant's current offense is a "major VUCSA." RCW 9.94A.535(3)(e). The presence of any of the six statutory factors may identify a current offense as a "major VUCSA." RCW 9.94A.535(3)(e)(i)-(vi). Conover challenges two of these six statutory factors that the jury considered in determining that his current offense was a "major VUCSA": (1) that his current offense involved at least three separate transactions, and (2) that the quantities involved were substantially larger than for personal use.

transactions. Br. of Appellant at 25 (citing RCW 9.94A.535(3)(e)(i)). Because Conover cites no authority to support his "plain meaning" argument, we need not consider it. RAP 10.3(a)(6).

Nevertheless, we note that a plain reading of the statute shows RCW 9.94A.535(3)(e)(i) applies when there are three separate transactions involving a controlled substance. *See State v. Reynolds*, 80 Wn. App. 851, 856, 912 P.2d 494 (1996).[9] Here, Conover was charged with and the jury heard evidence of three "separate transactions in which controlled substances were sold"[10]: twice in May 2011 and once in July 2011. Thus, the trial court did not err in instructing the jury to consider whether Conover's offense involved at least three separate transactions in which controlled substances were sold, transferred, or possessed with intent to do so.

2. Quantity "substantially larger than for personal use"

Conover argues that the second challenged aggravator does not apply because the State failed to prove that the quantities of heroin he sold were "substantially larger than for personal use." Br. of Appellant at 26 (quoting RCW 9.94A.535(3)(e)(ii)). We disagree.

In determining whether sufficient evidence supports a conviction, we consider "whether, after viewing the evidence in the light most favorable to the [State], any rational trier of fact could have found the essential elements of the [charged] crime beyond a reasonable doubt." *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S.

---

[9] Melina Reynolds was charged with two counts of delivery of a controlled substance and one count of delivery of a material in lieu of a controlled substance. *Reynolds*, 80 Wn. App. at 853. The issue was whether Reynolds' third transaction constituted an actual "sale" because it did not involve an actual controlled substance. Noting that the plain language of former RCW 9.94A.533(3)(e)(i) required at least three separate transactions involving actual controlled substances, we held that Reynolds' third transaction did not count. Nevertheless, we affirmed her exceptional sentence based on a different qualifying factor that established a major violation of the controlled substances act. *Reynolds*, 80 Wn. App. at 856, 859.

[10] RCW 9.94A.535(3)(e)(i).

14

307, 339, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). A claim of insufficient evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

Here, the record shows that the State presented sufficient evidence that the quantities of drugs he sold were substantially larger than for personal use. Detective Hanson testified that (1) a quarter-ounce of heroin was more than anyone would use in one day; (2) if an individual purchases a quarter-ounce it is probably for resale purposes, keeping "a little bit of that for their own usage," RP (Oct. 11, 2012) at 38; and (3) heroin *users* do not tend to "stockpile" heroin, instead buying enough for one or a few days at a time, spending about 10 to 20 dollars at a time. RP (Oct. 11, 2012) at 60. Corporal Watson testified that (1) a typical dose of heroin for maintenance users was about 0.2 to about 0.5, or a half gram or less if "they're just maintaining" and up to a gram or gram and a half for people who chose to abuse the drug, RP (Oct. 12, 2012) at 76; (2) dealers who buy an ounce, half ounce, or quarter-ounce usually "[break] it down further to sell to street dealers," RP (Oct. 12, 2012) at 79; (3) dealers who purchase quarter-ounces would likely break it down to an eighth of an ounce, about three-and-a-half grams, and break that down even further to a sixteenth of an ounce, a "teener," RP (Oct. 12, 2012) at 79, about 1.7 grams, closer to what an "end user might be using," RP (Oct. 12, 2012) at 80; (4) a maintenance user would break down a "teener" into even smaller amounts called a "point one, point two and so on," RP (Oct. 12, 2012) at 80; and (5) an end user would not be expected to buy

a quarter-ounce at a time and it was not common for end users to save their money to buy larger quantities at once. RP (Oct. 12, 2012) at 80.

Conover's three transactions involved quarter-ounce sales, more than the amount generally purchased for personal use: Conover was selling quarter-ounces of heroin, whereas an end user would likely possess about a sixteenth of an ounce. The State thus presented sufficient evidence to show that the quantities of heroin Conover sold were substantially larger than for personal use, for purposes of proving the RCW 9.94A.535(3)(e)(ii) aggravator and, thus, supporting the jury's finding.

### 3. Jury Instruction on "Substantially Larger than for Personal Use"

Conover also argues for the first time on appeal that the "substantially larger than for personal use" aggravating factor is unconstitutionally vague. Br. of Appellant at 27. Conover contends that the absence of "legally fixed standards" accorded the jury "standardless discretion" to decide this factor, violating due process. Br. of Appellant at 28. This argument fails; this aggravating factor is not unconstitutionally vague as applied here.

We may refuse to review a claim of error that the defendant did not raise below unless the error is manifest and affects a constitutional right. RAP 2.5(a)(3). The defendant must also show that the alleged error was not harmless beyond a reasonable doubt. *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1998). Due process principles are usually satisfied if a trial court instructs the jury on (1) each element of the charge, and (2) that the State must prove each element beyond a reasonable doubt. *Scott,* 110 Wn.2d at 690.

The constitution does not require that the meanings of particular terms used in an instruction be specifically defined. *Scott*, 110 Wn.2d at 691. Accordingly, jury instructions that

16

do not define particular terms are not "manifest" constitutional errors that can be raised for the first time on appeal. *Scott*, 110 Wn.2d at 688; *see also State v. O'Hara*, 167 Wn.2d 91, 107, 217 P.3d 756 (2009) (failure to provide statutory definition of malice when jury was instructed on all elements of the crime did not constitute manifest constitutional error).

Conover did not object to any jury instruction other than the reasonable doubt instruction. Because the trial court instructed the jury about each element of the crime charged, including the aggravating factors, its failure to provide a specific definition of "substantially larger than for personal use" does not amount to constitutional error. Thus, Conover cannot raise this vagueness issue for the first time on appeal. RAP 2.5(a)(3).

We affirm Conover's convictions, vacate his sentence, and remand for resentencing.[11]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Bjorgen, A.C.J.

Lee, J.

---

[11] At the resentencing hearing, the State may prove Conover's criminal history for purposes of establishing his correct offender score.